IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| BELINDA SHAFFER, | CASE NO. 4:20-CV-01474-JG |
| Plaintiff, | JUDGE JAMES GWIN |
| v. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Belinda Shaffer filed a Complaint against the Commissioner of Social Security on July 5, 2020, seeking judicial review of the Commissioner's decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (ECF #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was reassigned to me pursuant to General Order 2021-06 for preparation of a report and recommendation pursuant to Local Rule 72.2 (Non-document entry dated May 26, 2021). Following review, and for the reasons stated below, I recommend the Court **AFFIRM** the Commissioner's decision.

Ms. Shaffer also filed a motion to admit new and material evidence and to remand the case to the Commissioner. (ECF # 13). Following review, and for the reasons stated below, I recommend the Court **DENY** the motion.

On August 14, 2020, without leave of court or consent of the Commissioner, Ms. Shaffer filed an Amended Complaint, purporting to add a claim that the Commissioner violated her

constitutional rights to due process and equal protection, and its own policies, procedures, and regulations, when it failed to give Ms. Shaffer a protective filing date of September 2, 2019 on subsequent DIB and SSI claims. (ECF #7). Following review, and for the reasons stated below, I recommend the Court **DISMISS** this claim.

PROCEDURAL HISTORY

On December 1, 2017, Ms. Shaffer protectively filed a Title II application for a period of disability and DIB along with a Title XVI application for SSI. (Tr. 256, 266). As to both applications, Ms. Shaffer alleged disability beginning October 15, 2017. (*Id.*). These claims were denied initially on February 15, 2018 and on reconsideration on April 12, 2018. (Tr. 264, 274, 317, 321). Ms. Shaffer filed a written request for a hearing on May 11, 2018. (Tr 329-30). On May 30, 2019, Ms. Shaffer's attorney filed a written motion for medical expert testimony to address the limitations posed by Ms. Shaffer's impairments and whether those impairments equal a listing. (Tr. 828). On June 5, 2019, Ms. Shaffer's attorney confirmed Ms. Shaffer wished to proceed with the administrative hearing, but Ms. Shaffer would not like to attend a medical examination appointment scheduled by the Social Security Administration. (Tr. 498). Ms. Shaffer appeared and testified before an Administrative Law Judge on June 7, 2019. (Tr. 187). The ALJ determined Ms. Shaffer had not been under a disability from October 15, 2017. (Tr. 188).

On September 2, 2019, Ms. Shaffer requested the Appeals Council review the hearing decision (Tr. 383-85), and submitted additional medical records. (Tr. 2). The Appeals Council determined Ms. Shaffer's reasons for disagreeing with the ALJ's unfavorable decision did not provide a basis for changing the ALJ's decision. (Tr. 1). The Appeals Council also determined the

additional evidence did not show a reasonable probability of changing the outcome of the decision and denied Ms. Shaffer's request for review. (Tr. 2, 1).

## Factual Background

### I.  Administrative Hearing

Ms. Shaffer and Darren Wright, a vocational expert ("VE"), testified at the June 7, 2019 administrative hearing. A summary of the testimony is below.

### A.  Testimony From Belinda Shaffer

Prior to Ms. Shaffer's alleged onset of disability, she cleaned buildings. (Tr. 216).

Ms. Shaffer provided testimony about how lupus, seizures, and poor eyesight affect her. She cannot be in the sun or heat and leaves the house only to attend medical appointments. (Tr. 217-18). The lupus, diagnosed when she was 24 years old, affects her skin and joints. (Tr. 215, 220, 229). Sun and heat cause rashes shortly after exposure, and the resulting welts and rashes burn. (Tr. 229, 237). She described the feeling as "someone holding a lighter" to her skin. (Tr. 229). She uses medicated cream that helps somewhat. (Tr. 234). She has constant pain in all her joints, particularly in her legs. (Tr. 229, 215). She experiences lupus flare-ups approximately once a month, each lasting "a couple weeks." (Tr. 221). When the flare-ups occur, she must lay on the couch because she gets high fevers, her joints (knees, ankles, arms, wrists) swell, and "when the lupus gets too bad, it triggers the seizures." (Tr. 221, 235). Her children take care of her when she cannot leave the couch. (Tr. 221). For lupus flare-ups, she receives a shot and steroids from her doctor "a couple times a month." (Tr. 228). The shot and steroid combination is effective for approximately one week. (Tr. 228).

Anxiety and walking too far are additional triggers for Ms. Shaffer's seizures. (Tr. 218, 234). The seizures occur "a couple times a month," or "about three times a month." (Tr. 218, 225). When she has a seizure, she does not know what happens. (Tr. 224). Her children tell her that she shakes. (*Id.*). She gets "a weird feeling" down her arm and tries to sit down. (Tr. 225). This is all she remembers. (*Id.*). After a seizure, she wakes up and is not where she is supposed to be. (Tr. 224). The seizures affect her memory, causing her to forget days or weeks at a time. (Tr. 221).

Ms. Shaffer experiences a burning sensation, decreased grip strength bilaterally, numbness, and tingling in her hands. (Tr. 225). This causes her to "drop everything all the time." (*Id.*). She has difficulty picking up coins from a table and holding a pencil. (Tr. 236). It is difficult to use utensils, so Ms. Shaffer typically uses her fingers to pick up food. (*Id.*). The numbness in Ms. Shaffer's legs cause her to fall. (Tr. 225). These issues began near the end of 2017 or the beginning of 2018. (Tr. 226). Ms. Shaffer uses a cane prescribed to her by one of her rheumatologists, Dr. Rothenberg, because Ms. Shaffer kept falling. (Tr. 219-20). Even with the cane, she still falls; without the cane, she crawls. (*Id.*). She testified to permanent bruising on her knees. (*Id.*).

Ms. Shaffer has blurred vision. (Tr. 223). She had cataract surgery before the hearing but scar tissue build-up behind the lenses will require another eye surgery in the future. (Tr. 229-30).

Ms. Shaffer no longer does anything around the house. (Tr. 236). Her children are responsible for housework. (*Id.*). Ms. Shaffer avoids driving when possible and sometimes relies on her 17-year-old daughter for rides. (Tr. 214). She attempted to drive to the hearing but ultimately had to stop at a McDonalds to wait for her attorney to pick her up. (*Id.*).

**B.**     **Testimony from Vocational Expert Darren Wright**

The VE testified about Ms. Shaffer's ability to perform work. The ALJ asked the VE to begin with a person of Ms. Shaffer's age, education, and past work history. He instructed the VE to determine whether such a hypothetical individual could perform past relevant work under the following set of limitations: limited to sedentary work; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; frequently reach, handle, and finger with the bilateral upper extremities; avoid concentrated exposure to extreme cold and vibrations, extreme heat, loud and very loud noise, and very bright lights; avoid all exposure to hazards such as unprotected heights, moving mechanical parts, and the operation of motor vehicles; can perform simple, routine, and repetitive tasks but not at a production rate pace; and can respond appropriately to occasional change in a routine work setting if easily explained and demonstrated in advance of gradual implementation. (Tr. 247-48).

The VE testified that such a hypothetical individual would be unable to perform Ms. Shaffer's past relevant work but named sedentary unskilled jobs available in the national economy, namely, an Ink Printer, a Label Pinker, and a Hand Mounter. (Tr. 248). The ALJ asked if those jobs would be available if the hypothetical individual required a cane to ambulate, to which the VE testified affirmatively. (Tr. 248-49). However, those positions would be eliminated if the hypothetical individual required a cane to stand in addition to ambulation. (Tr. 249).

When the ALJ reduced the hypothetical individual's limitations from frequent to occasional handling and fingering with the bilateral upper extremities, the VE testified the combination of impairments would preclude all work. (Tr. 249).

5

The VE testified that an employer would typically tolerate an employee experiencing three seizures and two to three falls on the job before termination. (Tr. 250-51).

## II. RELEVANT MEDICAL EVIDENCE

### A. Medical Records

Daniel Miller, M.D., has been Ms. Shaffer's primary care physician since 2009. Throughout the years, Dr. Miller has treated Ms. Shaffer for systemic lupus erythematosus (SLE), pain in her legs, numbness in her hands and feet, and seizures. He often administered intramuscular injections of Decadron, a corticosteroid, and prescribed oral steroids for Ms. Shaffer's lupus flare-ups. (Tr. 562, 561, 559, 552, 546, 545).

In September 2017, Ms. Shaffer's cervical and lumbar x-rays were unremarkable, showing mild disc space narrowing at C4-C5 and C5-C6 with marginal osteophytes. (Tr. 629-31).

On January 26, 2018, Robert J. Brocker, Jr., M.D., consulted with Ms. Shaffer regarding numbness and pain in her hands and feet. (Tr. 625). These issues began years before. Ms. Shaffer stated that the pain, described as aching, throbbing, and shooting, radiated into her fingers, up her arms, and into her toes. (*Id.*). She noted the pain occurred frequently and disturbed her sleep. (*Id.*). Ms. Shaffer related weakness in her hands, arms, and legs with additional numbness and tingling in her hands and feet. (*Id.*). She claimed to have fallen recently on several occasions and stated she dropped things from her hands. (*Id.*). She related that nothing alleviated her pain and doing daily activity exacerbated it. (*Id.*).

Ms. Shaffer noted joint pain and stiffness, muscle weakness, back pain, neck pain, arm pain, and difficulty walking; a history of frequent headaches, lightheadedness, seizures, and stroke; vision issues in the left eye; and an active lupus flare-up. (Tr. 626). She denied recent fever, chills,

fatigue, diabetes, and weight change. (*Id.*). She related no history of memory loss, depression, anxiety, or insomnia, but did note nervousness. (*Id.*).

Neurological examination revealed dysesthesia of the hands and feet in a glove and stocking distribution compatible with diffuse pain typical of lupus involving the nerves, sluggish capillary refill, and multiple trigger points along the spine compatible with fibromyalgia. (*Id.*). Dr. Brocker noted a medium to wide based gait and left-hand ataxia on finger to nose testing. (*Id.*).

Motor examination revealed 5/5 strength of arms and legs without evidence of pronator drift, normal muscle tone, and no evidence of abnormal movement or muscle atrophy. (Tr. 627). Ms. Shaffer displayed normal, symmetrical reflexes. (*Id.*). Dr. Brocker diagnosed generalized seizure disorder, other inflammatory polyneuropathies, and fibromyalgia. (*Id.*). He determined that her pain stemmed from lupus and readjusted her medications, to include Cymbalta 60 mg two capsules daily. (*Id.*).

Ms. Shaffer attended a follow-up appointment with Dr. Brocker on February 21, 2018. (Tr. 650). She related having a seizure about three weeks prior. She denied memory loss, urinary incontinence, and biting of the tongue. (*Id.*). Ms. Shaffer complained of worsening numbness and pain in her hands and feet but denied recent fever, chills, diabetes, and weight change. (*Id.*). She continued to complain of joint pain and stiffness, muscle weakness, back pain, neck pain, arm pain, and difficulty walking. (Tr. 651). Dr. Brocker noted Ms. Shaffer's history of frequent headaches, lightheadedness, seizures, and stroke. (*Id.*).

Neurological examination again revealed dysesthesia of the hands and feet in a glove and stocking distribution compatible with diffuse pain from lupus involving the nerves, sluggish capillary circulation, multiple trigger points along her spine compatible with fibromyalgia, and left-

hand ataxia on finger to nose testing. (Tr. 651). Ms. Shaffer said Cymbalta provided only minimal alleviation of pain. (Tr. 651). Dr. Brocker added Lyrica for additional pain relief and ordered a brain MRI. (Tr. 651).

Ms. Shaffer attended another appointment with Dr. Brocker on March 23, 2018. (Tr. 647). By this time, Ms. Shaffer had prescriptions for Lyrica 50 mg three times daily, prenatal vitamins, Protonix 40 mg, Plaquenil 200 mg, Medrol 4 mg twice daily, Topomax 200 mg daily, Cymbalta 120 mg, and gabapentin 400 mg four times daily. (*Id.*). Ms. Shaffer had a seizure approximately thirteen days prior, and complained of vision loss, headaches, dizziness, joint pain and stiffness, muscle weakness, back pain, neck pain, arm pain, and difficulty walking. (Tr. 648). Ms. Shaffer denied recent fever, chills, fatigue, and weight change. (*Id.*).

She complained of daily migraines. (Tr. 649). Due to the frequency, Dr. Brocker increased Topomax to 300 mg daily, and added Cataflam 50 mg for early headaches and Imitrex 100 mg for severe migraines. (*Id.*). Ms. Shaffer's brain MRI showed minimal small vessel disease. (*Id.*). Dr. Brocker added low-strength aspirin for atherosclerosis changes. (*Id.*).

On March 27, 2018, Dr. Miller administered Decadron 10 mg and prescribed oral steroids for a lupus flare-up. (Tr. 739).

Ms. Shaffer began treating with Ralph Rothenberg, M.D., at the Boardman Ortho/Rheuma Office on April 19, 2018. (Tr. 679). At the initial appointment, Ms. Shaffer informed Dr. Rothenberg of her 2002 lupus diagnosis. (*Id.*). She noted that prednisone seemed to help. She complained of photosensitive rashes despite long-term use of hydroxychloroquine. (*Id.*). Ms. Shaffer claimed the recent increase in gabapentin helped partially and that Flexeril helps muscle soreness during flare-ups. (*Id.*).

8

Ms. Shaffer also related seizures occurring every few months and persistent headaches. (*Id.*). She noted that she frequently dropped objects from her hands and complained of tingling and numbness in her hands that was worse on the radial side along with decreased sensation in both legs distal to the upper calves. (*Id.*). Examination revealed normal joints except crepitus in the left knee and an abrasion below the right knee from a recent fall. (Tr. 681). Dr. Rothenberg noted decreased sensation distal to the lower calves but normal sensation to light touch in her fingers. (Tr. 682). Grip strengths measured 60 on the right and 45 on the left. (Tr. 706). Dr. Rothenberg removed hydroxychloroquine and prescribed Benlysta intravenous solution and subcutaneous injections once per month. (Tr. 682).

On May 18, 2018, Dr. Miller administered Decadron 10 mg and prescribed oral steroids for a lupus flare-up. (Tr. 741).

On June 20, 2018, Ms. Shaffer saw Dr. Brocker and noted her last seizure had occurred on May 17, 2018. (Tr. 716). She denied memory loss, urinary incontinence, and tongue-biting. (*Id.*). She denied recent fever, chills, fatigue, and weight change. She claimed joint pain and stiffness, muscle weakness, back pain, neck pain, arm pain, and difficulty walking, frequent headaches, and dizziness. (*Id.*). Dr. Brocker increased Ms. Shaffer's Lyrica for better pain and seizure control. (Tr. 718).

After receiving three Benlysta treatments Ms. Shaffer returned for a follow-up visit with Dr. Rothenberg on July 19, 2018. (Tr. 690). Dr. Rothenberg noted normal joints but decreased sensation in her legs and fingers. (Tr. 692-93). Ms. Shaffer's grip strength was measured at 0 on both hands. (Tr. 709). He opined that her pain was related to the neuropathy. (*Id.*).

On August 16, 2018, Ms. Shaffer returned to Dr. Rothenberg's office and related that the five Benlysta infusions had not improved her rashes or joint pain. (Tr. 697). She also stated she had a few seizures since the previous appointment and needed help dressing herself because of the joint pain. (*Id.*). Joint examination was normal, but Ms. Shaffer had decreased sensation distal to the knees and in the distal fingers. (Tr. 699-700). Her grip strength measured 20 bilaterally. (Tr. 709). Dr. Rothenberg prescribed a cane for Ms. Shaffer's balance difficulties and added mycophenolate. (Tr. 700).

On August 17, 2018, Dr. Miller administered Decadron 10 mg and prescribed oral steroids for a lupus flare-up. (Tr. 743).

On September 14, 2018, Ms. Shaffer returned to Dr. Brocker's office. (Tr. 712). She claimed she had five seizures between September 7 and September 9, 2018 and experienced memory loss and urinary incontinence. (Tr. 712). She also complained she did not have feeling in her hands, was falling more often, and had difficulties with balance. (*Id.*). In addition to her typical complaints of joint pain and stiffness, muscle weakness, back pain, neck pain, arm pain, and difficulty walking, Ms. Shaffer claimed fatigue, vision loss, and loss of appetite. (*Id.*). Dr. Brocker noted bruises from falling, lupus-related rash, and multiple trigger points along Ms. Shaffer's spine compatible with fibromyalgia. (Tr. 712-13).

On October 14, 2018, Ms. Shaffer was taken to the hospital after laying on the ground for days. (Tr. 845). Ms. Shaffer underwent a CT head scan for stroke-like symptoms, including left-sided weakness and slurred speech, which was unremarkable. (Tr. 792-93). On October 15, 2018, while still in the hospital, Ms. Shaffer's bilateral carotid artery ultrasound revealed atherosclerotic disease without significant stenosis. (Tr. 794-95). Her brain MRI findings were normal except for a

10

"nonspecific right frontal tiny focus of T2/FLAIR hyperintensity." (Tr. 796-97). She was discharged in stable condition on October 17, 2018. (Tr. 845). According to the discharge summary notes, she continued to complain of pain but was able to ambulate without issue. (*Id.*).

On November 7, 2018, Dr. Miller administered Decadron 10 mg and prescribed oral steroids for a lupus flare-up. (Tr. 747).

On December 13, 2018, Ms. Shaffer told Dr. Miller that she was off-balance a lot. (Tr. 748).

On January 10, 2019, Dr. Miller administered Toradol 60 mg for lupus-related pain. (Tr. 751).

On February 2, 2019, Ms. Shaffer had another CT head scan, which was also unremarkable. (Tr. 798-99).

On March 11, 2019, Dr. Miller decided Ms. Shaffer was a suitable candidate for medical marijuana to relieve lupus-related pain. (Tr. 755). She also underwent bilateral knee x-rays that showed well-preserved and symmetrical joint spaces, without effusion, fractures, or dislocations. (Tr. 800). A lumbar spinal x-ray revealed minimal facet sclerosis at L5-S1. (Tr. 801).

On March 18, 2019, Ms. Shaffer saw Dr. Tac Lee at the Lee Eye Center. (Tr. 802). Dr. Lee diagnosed bilateral age-related nuclear cataracts, for which Ms. Shaffer underwent surgery on April 11 and 18, 2019. (Tr. 806). She returned to Dr. Lee on May 13, 2019. (*Id.*). Dr. Lee diagnosed secondary cataracts after the initial surgery and determined further surgery was necessary. (*Id.*).

Ms. Shaffer returned to Dr. Rothenberg's office on April 22, 2019. She related difficulty driving and finding transportation. (Tr. 727). She claimed that her last seizure occurred in March

11

2019. Ms. Shaffer complained of persisting joint pain and decreased sensation distal to the knees and fingers. (Tr. 730).

On May 17, 2019, Ms. Shaffer saw Marlene Bednar, M.D., for a neurology consultation. (Tr. 821). During the consultation, Ms. Shaffer claimed her seizures occurred eight to ten times per month and that she had two seizures the previous weekend. (*Id.*). She claimed history of fatigue, muscle pain, seizures, syncope, confusion, decreased concentration, dysphoric mood, sleep disturbances,  and anxiety. She presented as mildly lethargic and exhibited reduced concentration with easy distractibility. (Tr. 825). Dr. Bednar determined that Ms. Shaffer was a poor historian and displayed fair to poor insight and judgment. Upon examination, Ms. Shaffer displayed 5/5 strength in the upper and lower extremities without tremor or drift and normal tone without cogwheeling or spasticity, and intact fine motor function in both hands. (Tr. 826). Dr. Bednar discussed the possibility that Ms. Shaffer's seizures were psychogenic rather than epileptic in nature. (*Id.*). She referred Ms. Shaffer to Cleveland Clinic's Department of Epilepsy for a second evaluation and prolonged video-EEG study. (*Id.*).

On May 27, 2019, Ms. Shaffer submitted, in advance of the administrative hearing, a handwritten list of seizure occurrences. (Tr. 811). According to Ms. Shaffer, she experienced seizures on the following dates:

- October 2018:       12, 18, and 24
- November 2018:       2, 14, and 21
- December 2018:       3
- January 2019:       5, 7, 13, and 22
- February 2019:       14, 17, and 29
- March 2019:       4, 9, 12, and 15

- April 2019:          1, 12, and 24

- May 2019:           2.

(*Id.*).

Finally, on June 5, 2019, Ms. Shaffer attended an initial appointment with Fabio Ochoa, M.D., at the Center for Arthritis of Warren, Inc. (Tr. 860). Dr. Ochoa's handwritten historical narrative is largely illegible. (*Id.*). Ms. Shaffer rated her pain at level two and denied fatigue. (*Id.*). She endorsed numbness and tingling, fever and chills, dry eyes, and joint pain. (Tr. 862). The doctor noted "walking concerns" as Ms. Shaffer's major limitation. (Tr. 860). Dr. Ochoa's neurological examination revealed very little as the doctor did not provide a narrative but simply placed check marks in the blank spaces next to mental status, motor, ambulation, paresthesias, Babinsky, and balance. (Tr. 861).

Dr. Ochoa performed a rheumatologic examination using the S-T-L system to record the degree of swelling, tenderness, and limitation of motion of Ms. Shaffer's joints. (*Id.*). He examined Ms. Shaffer's metacarpophalangeal (MPC) and proximal interphalangeal (PIP) joints in her fingers, her wrists, elbows, shoulders, knees, ankles, and metatarsophalangeal (MTP) joints in her feet. (*Id.*). The examination revealed no swelling but mild tenderness in all assessed joints. (*Id.*). Dr. Ochoa did not provide an assessment of motion limitation. (*Id.*).

Dr. Ochoa ordered x-rays that revealed bones and joints within normal limits except as to the left elbow (spur on the ulna) and left ankle (spur on the talar bone). (Tr. 867). Additionally, the PIPs in her right hand showed periarticular osteopenia. (*Id.*). Dr. Ochoa noted moderate decreased joint space medially and laterally in the right knee with a subchondral cyst of the distal femur and moderate to advanced decreased joint space medially in the left knee with a subchondral cyst of the distal femur. (*Id.*).

13

At the administrative hearing, Ms. Shaffer provided a list of current medications to the ALJ: alprazolam 1 mg twice per day, Lyrica 200 mg three times per day, gabapentin 600 mg three times per day, topomirate 100 mg twice per day, topomirate 200 mg twice per day, duloxetine 60 mg twice per day, and citalopram 20 mg once per day (Tr. 501).

**B.     Function Report**

In January 2018, Ms. Shaffer filed a Function Report with SSA detailing how her conditions limit her activities. She stated it is hard for her to be on her legs because when she moves "it feels like crushed glass" between her joints. (Tr. 447). On the other hand, she cannot sit for long because her joints will stiffen. (*Id.*). Ms. Shaffer experiences numbness in her hands, legs, and feet, which causes her to drop things and fall often. (*Id.*). Ms. Shaffer can walk "a few blocks, if at all," before she needs to rest. (Tr. 452). She uses a cane to walk. (Tr. 453). Ms. Shaffer also has pain in her hands and feet that disturb her sleep. (Tr. 448).

On a typical day, she moves from her bed to the couch and watches television or reads. (Tr. 448, 450). She does not have issues with personal care, but when Ms. Shaffer's mother was alive, she would shop and pay bills for Ms. Shaffer. (Tr. 448). When Ms. Shaffer must shop for groceries, she is out for approximately two or three hours. (Tr. 449). She prepares frozen meals in the microwave and gets additional help from her children. (Tr. 450). Ms. Shaffer does not do housework (other than folding laundry twice a week) or yardwork because she cannot be on her legs that long. (Tr. 448, 450). In addition, heat and sun exposure cause lupus flare-ups. (Tr. 449). She does drive sometimes but worries she will have a seizure and hurt someone. (*Id.*). Ms. Shaffer tries not to go out alone for fear of falling or having a seizure. (*Id.*).

14

### C.    Medical Opinion Evidence

On May 16, 2019, Dr. Miller opined that "due to patient's medical condition she is currently unemployable and will not be employable in the future."  (Tr. 810). Dr. Miller did not provide a narrative to establish how Ms. Shaffer's medical condition limited her functional abilities.

Dr. Ochoa prepared a letter, dated June 5, 2019, for Ms. Shaffer which indicated she "is on total disability due to active lupus, fever rash, joint pain." (Tr. 856). Dr. Ochoa did not provide a narrative to establish how lupus, rash, or joint pain limited Ms. Shaffer's functional abilities.

### D.    State Agency Evaluations

Initially, the Disability Determination medical consultant found Ms. Shaffer had medically determinable impairments of SLE, epilepsy, and fibromyalgia. (Tr. 260). The consultant found these impairments could reasonably be expected to produce Ms. Shaffer's alleged symptoms of pain, weakness, and fatigue, but the intensity of the symptoms and the impact on functioning are not consistent with the totality of the evidence. (Tr. 261). The consultant determined that Ms. Shaffer could perform at a light exertional level with the following limitations: never climb ladders/ropes/scaffolds; occasionally climb stairs and ramps; frequently stoop, kneel, and crouch; occasionally crawl; and avoid commercial driving and all exposure to dangerous machinery and unprotected heights. (Tr. 262-63). On reconsideration, the medical consultant added two additional limitations: avoid concentrated exposure to extreme cold and vibrations. (Tr. 282).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant bears the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only those claimants who satisfy each element of the analysis, including inability to do other work, and meet the duration requirements, are determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

The ALJ's decision, dated July 30, 2019, included the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.      The claimant has not engaged in substantial gainful activity since October 15, 2017, the alleged onset date (20 CFR 404.1571 *et seq.,* and 20 CFR 416.971 *et seq.*).

3.      The claimant has the following severe impairments: Seizure disorder, epilepsy and convulsive syncope; Systemic lupus erythematosus (SLE); Fibromyalgia; Migraine; Neuropathy; Obesity; and Anxiety (20 CFR 404.1520(c) and 20 CFR 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except never climb ladders/ropes/scaffolds, occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl; Frequently reach, handle and finger with the bilateral upper extremities; Avoid concentrated exposure to extreme cold and vibrations, extreme heat, loud and very loud noise, and very bright lights (brighter than a typical office setting), and avoid all exposure to hazards such as unprotected heights, moving mechanical parts and the operation of motor vehicles; Can perform simple, routine and repetitive tasks, but cannot perform tasks at a production rate pace such as assembly line work; Can respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on September 7, 1977 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969 and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 15, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 189-98).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 Fed. App'x 636, 641 (6th Cir. 2013) (cleaned up). A district court cannot

18

uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted).

Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## DISCUSSION

Ms. Shaffer alleges the ALJ's unfavorable decision is not supported by substantial evidence in three respects. First, Ms. Shaffer claims substantial evidence does not support the ALJ's determination that she does not meet or medically equal the severity of Listing 11.02 (Epilepsy) or 14.02 (Systemic lupus erythematosus), singly or in combination. (Pl. Br., ECF #14, PageID 987). Second, Ms. Shaffer claims the ALJ "erroneously found that plaintiff could frequently handle and finger in a work setting." *Id.* Third, Ms. Shaffer claims the ALJ "erred by finding there are significant number of jobs available of which plaintiff can perform. There are not, due to the frequency of plaintiff's seizures, lupus flairs [*sic*] and residuals from the neuropathy in plaintiff's hands." *Id.* I address each alleged error in turn.

### A.    Listings 11.02 (Epilepsy) and 14.02 (Lupus)

The Listing of Impairments "describes for each of the major body systems impairments that [the Agency] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of [her] age, education, or work experience." 20 C.F.R. § 404.1525(a). A claimant is disabled if she meets a particular Listing, set out in Appendix 1 to the Agency's

regulations. According to the Sixth Circuit, "in order to be found disabled based upon a listed impairment, the claimant must exhibit all the elements of the listing. It is insufficient that a claimant comes close to meeting the requirements of a listed impairment." *Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). To meet Listing 11.02, a claimant's epilepsy must be documented by a detailed description of a typical seizure and characterized by one of the following:

A.  Generalized tonic-clonic seizures, occurring at least once a month for at least three consecutive months despite adherence to prescribed treatment; or

B.  Dyscognitive seizures, occurring at least once a week for at least three consecutive months despite adherence to prescribed treatment; or

C.  Generalized tonic-clonic seizures, occurring at least once every two months for at least four consecutive months despite adherence to prescribed treatment; and a marked limitation in one of the following: (1) physical functioning; or (2) understanding, remembering, and applying information; or (3) interacting with others; or (4) concentrating, persisting, or maintaining pace; or (5) adapting or managing oneself; or

D.  Dyscognitive seizures, occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment; and a marked limitation in one of the following: (1) physical functioning; or (2) understanding, remembering, and applying information; or (3) interacting with others; or (4) concentrating, persisting, or maintaining pace; or (5) adapting or managing oneself.

20 C.F.R. § 404, subpart P, appendix 1 (cleaned up).

The regulations require "at least one detailed description of [the claimant's] seizures from someone, preferably a medical professional, who has observed at least one of [the claimant's] typical seizures." 20 C.F.R. § 404, subpart P, appendix 1, 11.00(H)(2). Ms. Shaffer argues the sheer number of her seizures would preclude her ability to perform any work because she would eventually have a seizure while at work. (Tr. 1007).

The ALJ determined "there is no credible evidence of the type of seizures described under the listings." (Tr. 190). Ms. Shaffer's medical records contain only self-reports of seizures. Without any documentation by a medical professional or someone other than Ms. Shaffer, she does not meet Listing 11.02 for epilepsy. The ALJ's determination is supported by substantial evidence.

Ms. Shaffer argues she does meet the Listing for SLE under 14.02. According to the Listings:

> SLE is a chronic inflammatory disease that can affect any organ or body system. It is frequently, but not always, accompanied by constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss). Major organ or body system involvement can include: Respiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis, vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia), skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders (inflammatory arthritis).

20 C.F.R. § 404, subpart P, appendix 1, 14.00(D)(1)(a).

To meet Listing 14.02, claimants must demonstrate the condition involves two or more organs/body systems, with one of the organs/body systems involved to at least a moderate level of severity; and at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). *Id.* at 14.02. Claimants may also meet the Listing if they have repeated manifestations of SLE, with at least two of the constitutional symptoms or signs and one of the following at the marked level: (1) limitation of activities of daily living; (2) limitation in maintaining social functioning; or (3) limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. (*Id.*).

The ALJ determined Ms. Shaffer does not meet Listing 14.02 because her medical records do not show at least two of the constitutional symptoms or signs. Ms. Shaffer argues she meets the

21

Listing because she has high fevers and lays on the couch during a lupus flare, which "would encompass severe fatigue and a marked if not extreme limitation in daily living activities, maintain social functioning, and completion of tasks in a timely manner." (Tr. 1009). I disagree.

Ms. Shaffer claims to have high fevers during lupus flare-ups but all medical records document normal temperatures. Moreover, according to the regulations, severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. 20 C.F.R. § 404, subpart P, appendix 1, 14.00(C)(2). Ms. Shaffer disclaimed fatigue at all medical appointments save for a visit with Dr. Brocker on September 14, 2018 and the initial neurological consultation on May 17, 2019. Ms. Shaffer's medical records do not show she suffers from even one constitutional symptom or sign and, therefore, the ALJ's determination that she does not meet Listing 14.02 is supported by substantial evidence.

Ms. Shaffer argues her impairment equals Listing 14.02 when considered in combination with "the time for recuperation of the seizures. Therefore, this matter must be remanded to the Commissioner for said consideration." (Tr. 1009). She also alleges that the frequency of lupus flare-ups and seizures would preclude all work. Ms. Shaffer does not offer any support for this undeveloped argument. However, the ALJ explicitly considered Ms. Shaffer's severe impairments, singly and in combination, and concluded that her impairments do not equal any of the Listings. The ALJ determined that Ms. Shaffer's claims as to the frequency of her seizures was inconsistent with the medical evidence. Medical records from Drs. Rothenberg and Miller indicate Ms. Shaffer's seizures occur every few months and Dr. Miller's records note that Ms. Shaffer's seizures are stable on medication.

Ms. Shaffer's argument amounts to a simple disagreement with the outcome of the ALJ's analysis. The fact that her own assessment of the record leads her to a different conclusion is not sufficient to overturn the ALJ's determination. *Thacker v. Comm'r of Soc. Sec.*, No. 1:18cv1647, 2019 WL 2212635, at *8 (N.D. Ohio May 22, 2019).

## B. Residual Functional Capacity[1]

Ms. Shaffer next argues, as it relates to the RFC, the ALJ "erroneously found that plaintiff could frequently handle and finger in a work setting." (Pl. Br., ECF #14, PageID 987). Ms. Shaffer points to her decreased grip strength, burning and numbness in her hands, and self-reports that she drops everything to claim she does not have the ability to handle or finger frequently. (Tr. 1010).

The ALJ considered Ms. Shaffer's decreased grip strength in conjunction with evidence of otherwise normal exam findings, including consistent 5/5 strength in her upper and lower

---

[1] The state agency reviewing physicians at the initial and reconsideration levels assessed Ms. Shaffer's functional limitations based on medical records up to February 15, 2018 and April 12, 2018, respectively. The ALJ considered these opinions in determining Ms. Shaffer's RFC but reduced her exertion level from light to sedentary. Ms. Shaffer's doctors did not provide medical opinions assessing her degree of functional limitation. On April 19, 2018, Ms. Shaffer's decreased grip strengths, measured by dynamometer and expressed as raw medical data, were first documented in the medical records and additional decreased grip strengths are noted on later dates. The ALJ mentioned the first measurement of decreased grip strength in his written decision but did not consider later measurements showing further decreased grip strength, nor did he provide further limitations to the RFC. "An ALJ may make a residual functional capacity finding without a physician's assessment 'where the medical evidence shows relatively little physical impairment.'" *Kizys v. Comm'r of Soc. Sec.*, No. 3:10-cv-25, 2011 WL 5024866, *3 (N.D. Ohio Oct. 21, 2011), citing *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008). However, "once it is determined that the evidence supports a finding of a severe impairment, the ALJ may be obligated to develop a record that provides substantial evidence supporting his or her RFC finding." *Falkowsky v. Comm'r of Soc. Sec.*, No. 1:19-cv-2632, 2020 WL 5423967, *6 (N.D. Ohio Sept. 10, 2020). Ms. Shaffer does not argue, and therefore I do not address, whether the ALJ's RFC determination, in the absence of a medical opinion made with the benefit of all pertinent medical records, was proper.

23

extremities, and intact fine motor function in both hands. Additionally, the ALJ considered hand x-rays that showed Ms. Shaffer's bones and joints within normal limits. Ms. Shaffer's argument is a request for the court to reweigh the evidence and come to a different conclusion. I decline to engage in such an exercise, because it is beyond the scope of permissible review.

### C. Available Jobs

Finally, Ms. Shaffer claims she is unable to perform any of the three jobs identified by the VE because she cannot use her hands frequently and the jobs all require working with moving mechanical parts, contrary to the RFC. (Pl. Br., ECF #14, PageID1011). Having addressed Ms. Shaffer's ability to handle or finger frequently, above, I only consider here Ms. Shaffer's argument that the RFC precludes the identified jobs based on proximity to moving mechanical parts.

The VE testified, based on the ALJ's RFC, that Ms. Shaffer could perform work as a Label Pinker, a Hand Mounter, and an Ink Printer. He testified his opinion was consistent with information contained in the *Dictionary of Occupational Titles* ("DICOT"), except as to his opinion regarding the use of a cane for ambulation and balance. According to DICOT, none of the identified positions involve activity related to moving mechanical parts. *See* DICOT 585.685-062, 1991 WL 684400; DICOT 976.684-018, 1991 WL 688613; DICOT 652.685-038, 1991 WL 685750. Therefore, Ms. Shaffer's argument is unavailing.

### REMAND UNDER SENTENCE SIX

Sentence six of 42 U.S.C. § 405(g) permits the Court to remand the case for further administrative proceedings without ruling on the merits. In conducting a sentence six remand, the court does not affirm, reverse, or modify the Commissioner's decision. *Melkonyan v. Sullivan,* 501 U.S. 89, 98 (1991). A claimant seeking remand based on sentence six of § 405(g) bears the burden

of showing (1) the evidence at issue is both new and material, and (2) there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

Evidence is new if it was not in existence or available to the claimant at the time of the administrative proceeding. *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990). Therefore, evidence available during the pendency of the administrative proceedings that was not obtained and submitted to the Commissioner in a timely manner is not "new evidence." *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477 (6th Cir. 2006).

Evidence is material if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). A post-decision evaluation is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 277-278 (6th Cir. 2010); *see also Jones*, 336 F.3d at 478 (evidence of subsequent deterioration in condition deemed immaterial); *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (same).

Finally, as to the good cause requirement, the Sixth Circuit applies a stringent standard under which a claimant must provide a valid reason for failure to obtain the additional evidence during the administrative proceedings. *Oliver*, 804 F.2d at 966.

Ms. Shaffer argues this Court should remand this case to the Appeals Council under sentence six of § 405(g) to consider new and material evidence. (ECF #13). The additional evidence includes medical records pre-dating the closing of the administrative record: a glasses

prescription dated May 13, 2019 (ECF #13-1, PageID 944), two office visits to Lee Surgery Center on May 13, 2019 and June 10, 2019 (ECF #13-2, PageID 945-59). The remaining additional evidence includes records post-dating the closing of the administrative record: a glasses prescription dated November 14, 2019 (ECF #13-1, PageID 943), an office visit to Lee Surgery Center on September 11, 2019 (ECF #13-2, PageID 960), and a follow-up neurology appointment with Dr. Bednar on December 4, 2019 (ECF #3-3, PageID 974). These records were previously submitted to the Appeals Council, which determined that the evidence "does not show a reasonable probability that it would change the outcome of the decision." (Tr. 58).

On May 13, 2019, about one month post-surgery for bilateral age-related cataracts, Ms. Shaffer's eye surgeon determined that Ms. Shaffer had developed secondary bilateral cataracts. (ECF #13-2, PageID 950). Eye examinations revealed normal findings except for posterior capsular haze bilaterally. (*Id.* at PageID 949). On June 10, 2019, Ms. Shaffer returned to Lee Surgery Center for a YAG laser surgery consultation to fix the secondary cataracts. (*Id.* at PageID 952). She complained of blurring and fuzzy vision and pain in the right eye. (*Id*). Eye examinations revealed normal findings except for posterior capsular haze bilaterally. (*Id.* at PageID 956).

On September 11, 2019, about one week post-YAG surgery in the left eye, Ms. Shaffer complained of seeing a shadow and had light sensitivity. (*Id.* at PageID 960). The record also notes that her left eye waters, she cannot see anymore, everything is blurry, she has a difficult time reading anything, her near vision is not good, and she spends most of her days in the dark with her eyes closed. (*Id.*). External and internal examination of Ms. Shaffer's eyes revealed all normal findings. (*Id.* at 968-69).

On December 4, 2019, Ms. Shaffer attended a follow-up neurology appointment with Dr. Marlene Bednar. (ECF #13-3, PageID 974). Dr. Bednar had referred Ms. Shaffer to the Cleveland Clinic Department of Epilepsy for a five-day non-invasive video-EEG monitoring procedure. (*Id.* at PageID 981). Despite sleep deprivation, activation procedures, and withdrawal of all prescriptions, video monitoring did not capture any seizures and revealed no clear evidence of active epilepsy. (*Id.*). Dr. Bednar also reviewed Ms. Shaffer's psychiatry evaluation with Dr. Jiminez, who noted the following:

> Central sensitization syndrome with diffuse body pain and fibromyalgia, history of narcotic/benzodiazepine use, anxiety/depression. Psychogenic non-epileptic seizures should be considered until proven otherwise and functional blindness/visual impairment, complex PTSD, amplification of symptoms for secondary gain with disability applications frequently reattempted, history of substance use disorder, personality traits of dependence/codependence, anxiety, somatizations, interpersonal dysfunction, affective dysregulation, impulsivity, perpetuation of sick role and maladaptive behaviors preventing driving, work, etc.

(*Id.*).

After reviewing these records, Dr. Bednar characterized Ms. Shaffer's condition as psychiatric pseudoseizures related to anxiety/stress, depressive disorder and malingering again versus conversion reaction. (*Id.* at PageID 985). Dr. Bednar advised Ms. Shaffer to treat with a psychiatrist. (*Id.*).

Ms. Shaffer argues that her vision deteriorated after the ALJ's unfavorable decision and that the functional blindness diagnosis "is a material and significant diagnosis affecting [Ms. Shaffer's] functional and non-exertional limitations." (ECF #13, PageID 939).

I recommend against remanding the case under sentence six. Most of the records are new in that they were not available before the administrative hearing or within the thirty days in which

the administrative record remained open. However, Ms. Shaffer has not shown that the medical records relate to the period of disability considered by ALJ, nor has she shown a reasonable probability that the ALJ would have reached a different disposition of the disability claim if presented with the new evidence.

The ALJ's unfavorable decision contemplated Ms. Shaffer's nuclear age-related cataracts and determined the condition was not severe at Step Two of the sequential analysis because "the medical evidence demonstrates that this condition imposes no more than a minimal limitation on [Ms. Shaffer's] ability to perform basic work activities and evidences that it has improved or will improve within twelve months with treatment and/or medication . . . ." (Tr. 190). The records Ms. Shaffer now offers show that the cataracts had resolved by September 11, 2019, where examination revealed no posterior capsular haze. In addition, the nature of Ms. Shaffer's complaints shifted after her last eye surgery. Rather than simply having blurry vision, Ms. Shaffer began to see a shadow and experienced watering of her left eye, a new and distinct issue from her cataracts. That a psychiatric consultation considered a diagnosis of functional blindness supports the notion that her cataracts had resolved. Therefore, Ms. Shaffer's current vision issues do not relate to the alleged period of disability, October 15, 2017 to the date of the ALJ's unfavorable decision, July 30, 2019.

Even if this Court determined the records do relate to the period of disability considered by the ALJ, Ms. Shaffer has not shown a reasonable probability the ALJ would have reached a different conclusion because the records do not offer a medical opinion about Ms. Shaffer's functional limitations. Without such a showing, Ms. Shaffer cannot prevail on her motion to remand under sentence six.

PROTECTIVE FILING DATE

On August 14, 2020, without leave of court or consent of the Commissioner, Ms. Shaffer filed an Amended Complaint, asserting a claim alleging that the Commissioner violated her constitutional rights to due process and equal protection, and its own policies, procedures, and regulations when it failed to give Ms. Shaffer a protective filing date of September 2, 2019 on subsequent DIB and SSI claims. (ECF #7).

This claim should be dismissed. First, Ms. Shaffer did not file her Amended Complaint in accordance with the Federal Rules of Civil Procedure. Rule 15 allows a party to file an amended pleading once as a matter of course within twenty-one days after serving it or twenty-one days after service of a responsive pleading. Fed. R. Civ. P. 15(a)(1). In all other cases, a party may amend a pleading only with the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). Ms. Shaffer's Amended Complaint was not filed in compliance with any of these provisions. Therefore, the purported Amended Complaint is a nullity. *See* 6 Charles A. Wright, *et al.*, Fed. Prac. & Proc. Civ. § 1484 (3d ed. 2015) ("[I]f an amendment that cannot be made as of right is served without obtaining the court's leave or the opposing party's consent, it is without legal effect and any new matter it contains will not be considered unless the amendment is resubmitted for the court's approval.") (footnote omitted); *see also United States ex rel. Mathews v. HealthSouth Corp.*, 332 F.3d 293, 296 (5th Cir. 2003) ("The failure to obtain leave results in an amended complaint having no legal effect.").

Moreover, Ms. Shaffer did not address the additional claim in her Brief on the Merits, thereby waiving the claim. *Murr v. United States*, 200 F.3d 895, 902, n.1 (6th Cir. 2000) ("Issues and arguments not presented to the Magistrate Judge are deemed waived.").

CONCLUSION

For the foregoing reasons, I recommend that the Court **AFFIRM** the final decision of the Commissioner of Social Security denying Ms. Shaffer's application for benefits. I further recommend that the Court **DENY** Ms. Shaffer's motion to admit new and material evidence and to remand the case to the Commissioner. Finally, I recommend that the Court **DISMISS** Ms. Shaffer's additional claims first raised in the Amended Complaint.

Dated: August 10, 2021

_____

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).